**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CRYSTAL BESHAW,**

                             **Plaintiff,**

     **vs.**                                  **8:15-CV-556**
                                             **(MAD)**

**COMMISSIONER OF SOCIAL SECURITY,**

                            **Defendant.**
_____

**APPEARANCES:**                       **OF COUNSEL:**

**OFFICE OF MARK A. SCHNEIDER**     **MARK A. SCHNEIDER, ESQ.**
57 Court Street
Plattsburgh, New York 12901
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**     **JASON P. PECK, ESQ.**
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

     Crystal E. Beshaw ("Plaintiff") commenced this action on May 5, 2015, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). *See* Dkt. No. 1.

### II. BACKGROUND

On July 30, 2012, Plaintiff protectively filed applications for DIB and SSI. *See* Dkt. No. 9, Administrative Transcript ("T."), at 153-161. Both applications were denied at the initial level and upon reconsideration by the state agency pursuant to 20 C.F.R. §§ 404.1503 and 416.903. *See id.* 12, 93-96. Plaintiff then requested a hearing by an administrative law judge. *See id.* at 101-08. A video-conference hearing was conducted on December 10, 2013, before Administrative Law Judge Dale Black-Pennington (the "ALJ"). *See id.* at 12, 28-84. The ALJ issued an unfavorable decision to Plaintiff dated February 19, 2014. *See id.* at 9-27. The ALJ made the following determinations: (1) Plaintiff meets the insured status requirements of the Social Security Act; (2) Plaintiff has not engaged in substantial gainful activity since July 18, 2011, the onset of the alleged disability; (3) Plaintiff's severe impairments include childhood hydrocephalus with ventriculoperitoneal ("VP") shunt placement, heart disorder, asthma, anxiety disorder, and mood disorder; (4) Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a Listed Impairment in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926 (the "Listed Impairments"); (5) Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(a), is able to perform simple rote tasks, follow and understand simple instructions and directions, and have superficial transactional contact with co-workers and the general public, except that Plaintiff can occasionally climb ramps and stairs, must avoid concentrated exposure to respiratory irritants, and must avoid vibrations, heavy moving mechanical parts, and unprotected heights, and must have a fixed work schedule; (6) Plaintiff has no past relevant work; (7) Plaintiff was 20 years old on the alleged disability onset date; (8) Plaintiff has at least a high school education and is able to communicate in English; and (9) considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in

2

significant numbers in the national economy that Plaintiff can perform. *See id.* at 14-22. Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from July 18, 2011 through the date of the ALJ's decision. *See id.* at 23.

Plaintiff timely filed a request for a review of the ALJ's decision with the Appeals Council, *see id.* at 101-108, and, in a notice dated April 30, 2015, the request was denied rendering the ALJ's decision the Commissioner's final decision, *see id.* at 1-4. Plaintiff then commenced this action for judicial review of the denial of her claims by filing a complaint in this Court on May 5, 2015. *See* Dkt. No. 1. Both parties have moved for judgment on the pleadings. *See* Dkt. Nos. 13, 17.

### 1. Plaintiff's Hearing Testimony

At the December 10, 2013 hearing, Plaintiff testified that her formal education culminated in graduating from high school with an individualized education program ("IEP") diploma and she received child care vocational training through her high school. *See id.* at 37, 52-53. In her everyday living, Plaintiff is able to take care of her personal hygiene, is able to drive up to two miles at a time, and can manage her own finances. *See id.* at 34-37. Plaintiff lives with her boyfriend, who does the shopping and cooking for the family and is the primary caretaker for their three-year-old daughter. *See id.* at 36, 59-64. Plaintiff can walk for approximately 30 minutes, stand for 20 minutes, and is able to squat. *See id.* at 45-46.

Plaintiff contends that she became disabled as of July 18, 2011 due to back pain. *See id.* at 39-40. She currently gets cortisone shots in her back, suffers from a herniated disc, has scoliosis of her spine, and has been instructed not to lift over 10 pounds. *See id.* at 40. Plaintiff has a VP shunt in her head to help relieve pressure in her brain as a result of contracting hydrocephalus as a child. *See id.* at 56. Plaintiff claims that she has frequent headaches that

require a doctor to adjust her shunt, but she had only had two shunt operations in the previous year. *See id.* at 53. Plaintiff contends that she gets headaches approximately twice per week, after which she is not able to drive for three to six weeks, and suffers from stress seizures approximately every two weeks. *See id.* at 36-37, 42-43, 56. Plaintiff smokes one-half of a pack of cigarettes per day and has asthma, which causes breathing difficulty. *See id.* at 64-65.

Plaintiff's past employment includes working as an after-school program daycare provider at Saranac Central PALS Inc. ("PALS"). *See id.* at 38, 244. She was terminated from this position in the August of 2012, which Plaintiff believes was for missing too much work. *See id.* at 38, 51. Plaintiff also previously worked at Wal-Mart for a short period as a factory worker. *See id.* at 53, 68. Plaintiff is currently unemployed, but was submitting approximately 12 applications per week prior to filing for SSI and DIB insurance. *See id.* at 38-39. She stopped applying for work because she did not receive any responses. *See id.*

Plaintiff testified that she is unable to work due to her back pain, anxiety, depression, headaches, short-term memory problems, and decreased dexterity in her right arm. *See id.* at 39-40. Plaintiff first testified that she currently has normal use in both hands, but later stated that her right wrist hurts and her fingers on that hand go numb occasionally. *See id.* at 46, 64. Plaintiff stated that she attended five physical therapy sessions in April and May of 2013 for her back pain. *See id.* at 41. Plaintiff received counseling services for her anxiety, depression, and suspected bipolar disorder for approximately one-and-a-half months at Behavior Health Services North ("BHSN"). *See id.* at 45, 60.

### 2. Vocational Expert Testimony

Vocational expert Ms. Plant testified at the hearing as follows. Ms. Plant stated that she reviewed Plaintiff's adult disability report, but did not review the work history report. *See id.* at

67. Ms. Plant concluded that Plaintiff would not be able to perform any of her past work. *See id.* at 71-72. She did conclude that Plaintiff would be able to perform the job of an addresser, document preparer, and a bakery worker on the conveyor line, all of which are sedentary positions. *See id.* at 72-74. Upon cross examination, Ms. Plant testified that Plaintiff could likely not serve in certain circumstances as a document preparer if she could not meet the physical demands of standing and bending. *See id.* at 80. A person who could not be on task at least half of the day, or required constant supervision, could not serve in any of these positions. *See id.* at 81.

### 3. Relevant Medical Records

From November 25 through December 11, 2012, Plaintiff was hospitalized for abdominal pain and headaches caused by a suspected infection of her VP shunt catheter. T. at 1050. The infection was treated with surgery and antibiotics and Plaintiff's shunt strata valve was adjusted from 1.5 to 0.5, which resolved her headaches. *Id.* at 1051. The infection was suspected as a result of her recent appendectomy. *Id.* at 486. In a December 13, 2012 follow up appointment, Plaintiff reported that she had acute abdominal pain, *id.* at 576, and on December 19, 2012, Plaintiff reported mild abdominal pain and a vague headache. *Id.* at 503. After testing of Plaintiff's shunt, it was determined that no infection was present. *Id.* at 1163.

In a March 7, 2013 follow up to a complaint about another possible shunt infection, Plaintiff reported that she has minor headaches maybe every other day. *Id.* at 512. Dr. Bruce Tranmer from Fletcher Allen Health Care stated that the headaches "are not too concerning." *Id.* All other exams and CT scans showed Plaintiff's shunt and valves were working properly. *Id.* Dr. Tranmer increased the valve setting to 1.5 to try to resolve Plaintiff's lingering headaches. *Id.* Plaintiff reported that she did not have any headaches after this visit until approximately three

months later in June of 2013. *Id.* at 1163. On June 16, 2013, Plaintiff returned to the doctor with complaints of abdominal pain and a headache. *Id.* at 1148. On this occasion, Plaintiff stayed at the hospital for four days and a shunt tap was conducted, which showed no sign of infection or shunt malfunction. *Id.* at 1149, 1154.

Plaintiff went to the emergency room on September 2, 2013 with complaints of abdominal pain and was diagnosed with gastritis, which may have been caused by taking her prescription medications. *Id.* at 670. At this appointment, Plaintiff had a CT scan to check on her shunt functioning, which showed no negative impacts on the brain and no evidence of shunt malfunction. *Id.* at 673. On November 12, 2013, Plaintiff had a progress/follow-up appointment with Dr. Tranmer. *Id.* at 1194. In the notes for this visit, Dr. Tranmer indicated that Plaintiff's abdominal pain had not returned since her prolonged hospital stay in June of 2013. *Id.* Further, Plaintiff stated that she gets an occasional headache, "but otherwise is doing well." *Id.* Dr. Tranmer stated that Plaintiff's shunt was working properly and suggested that she check back in after a year to make sure everything is still in order. *Id.*

Between February of 2012 and June of 2013, Plaintiff saw her doctor at least 13 times for complaints of headaches or abdominal pain. *See id.* at 680, 694, 698-99, 719-21, 757, 761, 779, 803, 821, 840, 847, 856, 893, 905. None of these visits produced any significant medical findings or abnormalities that explained her reported symptoms. Prior to 2012, Plaintiff had numerous other shunt adjustments and doctor visits to deal with complaints of nausea and headaches. *See generally id.* at 295-361. During one of these visits on November 14, 2011, Plaintiff was seen for an assessment of her hydrocephalus and to check the functioning of her VP shunt. *Id.* at 281. This appointment concluded that she is "doing very well" and that her "CT scan looks very good."

*Id.* Plaintiff was instructed to follow up in two years or call if any of her symptoms changed. *Id.*

On July 20, 2012, Plaintiff went to Plattsburgh Medical Care for a complaint of right arm pain that had been present for several months. *Id.* at 405. On October 17, 2012, Plaintiff had right ulnar nerve compression surgery at the Champlain Valley Physicians Hospital Medical Center by Dr. Stephane Mulligan. *Id.* at 484, 991-92. At a physical exam on October 10, 2012, consultant Dr. David G. Welch examined Plaintiff and determined that she had full range of motion in all extremities and her gross and fine motor coordination was intact. *Id.* at 442.

On October 29, 2012, Plaintiff saw Dr. Joseph C. Samaras as a follow up to an emergency room visit that she had two days prior for acute lower back pain, which she injured while lifting boxes to help a friend move. *Id.* Again on February 24 and March 22, 2013, Plaintiff sought emergency care for reported back pain. *Id.* at 749, 772. Testing revealed that Plaintiff had sciatica and she was prescribed pain relieving medication and told to rest. *Id.* at 749-52, 772. On May 24, 2013 Plaintiff had an appointment at Urgicare of the Northeast for a second opinion concerning her scoliosis and uneven leg length. *Id.* at 545. Nurse practitioner Linda R. Bailey discussed treatment options including a heel lift and physical therapy. *Id.* at 546. Starting on April 16, 2013, Plaintiff attended six physical therapy sessions at Champlain Valley Physicians Hospital. *Id.* at 602. After these visits, Plaintiff reported that her back pain had lessened, with some days being pain free and others having pain in the center of her back. *Id.* On June 10, 2013, Plaintiff underwent another back exam for her back pain and scoliosis. *Id.* at 538. The exam revealed that there was no acute fracture or dislocation of the spine, and a slight dextroscoliosis of the lumbar spine with the apex at L2-L3. *Id.*

At an April 8, 2013 pain management appointment with Dr. Farah Siddiqui, Plaintiff reported that she initially injured her back in 2009 during nursing school, but did not mention the recent incident that occurred while helping her friend move. *Id.* at 631. She reported lower back pain radiating down the back of both legs to her toes and that the pain increased with bowel movements or coughing and sneezing. *Id.* Upon initial examination, Dr. Siddiqui ordered tests to determine if Plaintiff had lumbar radiculopathy, lumbar degenerative disc disease, and lumbar myofascial pain syndrome. *Id.* at 632. Plaintiff had a follow-up EMG and CT scan. The EMG showed a completely normal study, and the CT scan showed mild degenerative disc changes. *Id.* at 634. Dr. Siddiqui recommended a medial branch block to help relieve Plaintiff's back pain. *Id.* at 634-35. On July 25, 2013, Plaintiff had a successful medial branch block operation on her lower back. *Id.* at 642. At an August 12, 2013 follow up with Dr. Brian Lecuyer, Plaintiff stated that she still had radiating back pain and would like further treatment. *Id.* at 643. Dr. Lecuyer recommended that Plaintiff receive a sacroiliac joint corticosteroid injection, which she received on September 11, 2013. *Id.* at 643, 645. Plaintiff reported that this injection did not relieve all of the pain in her back, however the pain in her lower back was gone and it was her upper back that started to hurt. *Id.* at 647.

Plaintiff's extensive medical history includes numerous other emergency room and urgent care visits. Any additional relevant medical records will be discussed as necessary in the application sections set forth below. For the following reasons, the Court orders that the Commissioner's decision is affirmed.

### III. DISCUSSION

**A.      Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 447 (2d Cir. 2012); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The Court must examine the administrative transcript as a whole to determine whether the decision is supported by substantial evidence and whether the correct legal standards were applied. *See Brault*, 683 F.3d at 447; *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)). The Second Circuit has explained that upholding a determination based on the substantial evidence standard where the legal principals may have been misapplied "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, if the record is such that the application of the correct legal principles "could lead to only one conclusion, there is no need to require agency reconsideration." *Id.*

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotation marks omitted). If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and the court is not permitted to substitute its analysis of the evidence. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("[The court] would be derelict in [its] duties if we simply paid lip service to this rule, while shaping [the court's] holding to conform to

our own interpretation of the evidence").  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).  This very deferential standard of review means that "once an ALJ finds facts, [the Court] can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"  *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**B.      Analysis**

Plaintiff contends that the ALJ's denial of her disability applications should be remanded back to the Commissioner for the following reasons: (1) the ALJ erred by failing to consider the combination of Plaintiff's ailments, which render her disabled; (2) the ALJ incorrectly determined in Plaintiff's RFC that she can perform light work; (3) the ALJ posed an improper hypothetical question to the vocational expert; (4) the ALJ did not properly determine the credibility of Plaintiff's testimony; and (5) the ALJ erred in granting great weight to consultant opinions and significant weight to others.  *See* Dkt. No. 13 at 19-43.

### *1. Five-Step Analysis*

For purposes of both DIB and SSI, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

> The Social Security Administration regulations outline the five-step, sequential evaluation process used to determine whether a

claimant is disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v).

### 2. *Severe Impairments*

At step two, the medical severity of a plaintiff's impairment is evaluated. A Plaintiff must have a "severe medically determinable" impairment. 20 C.F.R. §§ 404.1520; 416.920. The "severity regulation" states as follows:

If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

20 C.F.R. §§ 404.1520(c); 416.920(c), *see Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). The phrase "basic work activities" are "the abilities and aptitudes necessary to do most jobs" and include

[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b); *see Bowen*, 482 U.S. at 141.

The purpose of the severity regulation was to create a "threshold determination of the claimant's ability to perform basic, generically defined work functions, without at this stage engaging in the rather more burdensome medical-vocational analysis required by [42 U.S.C.] § 423(d)(2)(A)." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995). In *Bowen v. Yuckert*, the Supreme Court upheld this regulation to screen out *de minimis* claims – those claims where there are "slight abnormalities that do not significantly limit any 'basic work activity.'" *Bowen*, 482 U.S. at 158 (O'Connor, J. concurring).

Plaintiff contends that the ALJ erred by failing to find that Plaintiff's obesity, back pain, seizure disorder, headaches, memory loss, abdominal pain, and ulnar and cubital tunnel nerve limitations, when viewed in combination, were severe impairments. *See* Dkt. No. 13 at 19-30. The Court need not presently consider Plaintiff's argument on this point since the ALJ correctly determined that Plaintiff suffered severe impairments from her numerous other conditions. *See* T. at 14. Since the purpose of the severe impairment regulation is to screen out *de minimis* claims, and since Plaintiff has passed this step of the disability evaluation, to the extent that the ALJ improperly concluded that her remaining conditions were not severe, any such error was harmless. *See Reices-Colon v. Astrue*, 523 Fed. Appx. 796, 798 (2d Cir. 2013) (holding that any alleged error determining impairments to be non-severe was harmless where other severe impairments were identified and the ALJ proceeded with the disability analysis giving consideration to the non-severe impairments in the subsequent steps) (citations omitted); *Bell v. Colvin*, No. 7:12CV1813, 2015 WL 224662, *7 (N.D.N.Y. Jan. 15, 2015). As discussed below, the Court will address Plaintiff's argument that these conditions must be evaluated in combination, rather than as individual impairments, in determining whether her conditions amount to a listed impairment and in evaluating her RFC.

### 3. Listed Impairments

At step three of the disability analysis, a plaintiff who meets or medically equals one of the Listed Impairments in 20 C.F.R. Part 404, Subpt. P, App. 1 ("Listed Impairments"), is "conclusively presumed to be disabled and entitled to benefits." *Dixon*, 54 F.3d at 2022. Plaintiff contends that the ALJ failed to evaluate her impairments in combination and, thus, incorrectly determined she did not meet the Listed Impairments of § 1.00 (Musculoskeletal System), § 3.00 (Respiratory System), and § 12.05 (Intellectual Disability).

### a. Obesity

Plaintiff contends that the ALJ failed to consider the effects of her obesity in combination with her other impairments to find that Plaintiff had a listed impairment of the musculoskeletal system (§ 1.00(Q)) and respiratory system (§ 3.00(I)). Both § 1.00(Q) and § 3.00(I) provide essentially the same requirement that these impairments must be evaluated in combination with a plaintiff's obesity.

> Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal [and respiratory] system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal [and respiratory] impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(Q); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(I). SSR 02-1p provides additional guidance for how an ALJ should consider obesity in evaluating a plaintiff's alleged disability. This ruling states that there are three levels of obesity,

"[l]evel I includes BMIs of 30.00-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed 'extreme' obesity . . . includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." SSR 02-1P, 2002 WL 34686281, *2 (Sept. 12, 2002). The ruling discusses that BMI is not the sole factor in determining obesity, and notes that it "will usually be evident from the information in the case record whether the individual should not be found to have obesity, despite a BMI of 30.0 or above." *Id.*

> When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI [the ALJ] may ask a medical source to clarify whether the individual has obesity. However, in most such cases [the ALJ] will use [his or her] judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.

*Id.* at *4.

In filling out her disability report, Plaintiff did not list obesity as a condition that limits her ability to work. T. at 197. None of the medical records discuss Plaintiff's obesity as a factor that negatively affects her daily functioning or exacerbates her other impairments. Moreover, Plaintiff was not questioned at the hearing either by her attorney or the ALJ about the impacts of her obesity. The only reference to Plaintiff's obesity in the medical records are notations of her height and weight and that she has a BMI of 33.018. *See id.* at 536. The ALJ did not address Plaintiff's obesity in her decision. However, an ALJ should not be expected to be an advocate for a claimant by scouring the record to find any potential unraised impairments that the claimant may have, especially in this case when none of the medical records mention obesity or any negative impacts that Plaintiff's weight may have on her functioning ability. Moreover, a plaintiff bears the burden to establish her entitlement to benefits at the first four steps of the evaluation, which Plaintiff has

not done in this case in regards to her obesity by failing to mention it as an impairment and by her attorney's failure to raise the issue during the hearing testimony. *Cf. Sellers v. Heckler*, 590 F. Supp. 1141, 1146 (S.D.N.Y. 1984) ("[P]laintiff's mental impairment, if any, was not raised by her in her initial application, but was suggested by Dr. Sang in his testimony at the hearing. Plaintiff's failure to allege a mental impairment until after the hearing casts further doubt on the existence of such a disability"). The absence of any meaningful mention of Plaintiff's obesity in the record, coupled with Plaintiff's failure to raise this issue prior to her action in this Court, supports the ALJ's determination to not consider Plaintiff's obesity in evaluating her listed impairments. Accordingly, the Court finds that the ALJ did not commit reversible legal error by failing to consider Plaintiff's obesity in combination with her other impairments.

### b. Intellectual Disability

Plaintiff contends that the ALJ failed to develop the record sufficiently to determine that she did not meet the listed impairment of § 12.05 for Intellectual Disability. *See* Dkt. No. 13 at 26. A plaintiff meets the qualifications of § 12.05 if his or her IQ is below 59, or between 60 and 70 in addition to several other factors. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Plaintiff argues that the ALJ should not have eliminated this listed impairment without first conducting an IQ test. The Court finds that the record support's the ALJ's decision to not consider this listed impairment and that the record was sufficiently developed.

None of Plaintiff's medical records from her hospital visits note severely limited intellectual functioning. Thus, the only evidence on this area is from Plaintiff's testimony, consultants' opinions, and a record from Plaintiff's IEP for high school. In 2009, when Plaintiff was 18 years old, she scored a 90 on an IQ test to determine if she was still qualified as a student with a learning disability. T. at 189. In Plaintiff's adult disability report, the interviewer S. Leary

stated that Plaintiff "seems to be of average intelligence." *Id.* at 194. In filling out her disability report, Plaintiff did not list lower intellectual functioning as a condition that limits her ability to work. *Id.* at 197. Physical examining consultant Dr. Welch stated that Plaintiff showed "some difficulties with cognitive function." *Id.* at 442. He noted that it took Plaintiff approximately two minutes to make change for a dollar. *Id.* While Plaintiff contends that Dr. Welch recommended an IQ test, *see* Dkt. No. 13 at 26, he merely opined that "a more thorough psychological assessment may be able to give greater input as to [Plaintiff's] true cognitive function." T. at 442. Thereafter, Brett T. Hartman Psy. D., performed a consultive psychiatric examination of Plaintiff on October 12, 2012. *Id.* at 444-48. Mr. Hartman concluded that Plaintiff's "[i]ntellectual functioning appears to be significantly below average with a lower than average general fund of information." *Id.* at 446. Further he stated that Plaintiff "has significant learning difficulties and would likely have problems performing complex tasks independently[,]" but she is "able to follow and understand simple directions [and] has a fair ability to maintain attention and concentration." *Id.* at 447.

Plaintiff contends that the ALJ should have ordered an IQ test because one of Mr. Hartman's diagnoses was to "[r]ule out borderline intellectual functioning." *Id.* The Diagnostic and Statistical Manual of Mental Disorders ("DSM"), Fourth Edition, which was the most recent edition of the DSM during the time that Plaintiff was being evaluated, defines "borderline intellectual functioning" as "an IQ range that is higher than that for Mental Retardation (generally 71-84)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 45 (4th Ed. 2000). Thus, even if Plaintiff were at the low end of borderline intellectual functioning, her IQ level would still be above that required to meet the listed impairment in § 12.05. Accordingly, the Court finds that the ALJ's decision to not require an additional IQ test

16

and not to consider Plaintiff's impairments under § 12.05 is supported by substantial evidence in the record.

### 4. Evaluating Opinion Evidence

A plaintiff's treating physician is considered an "acceptable medical source." 20 C.F.R. 404.1513(a). If an ALJ refuses to assign a plaintiff's treating physician's opinion controlling weight, he or she must state a good reason for that determination. *See Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011). The "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). The regulations list factors that the ALJ should consider when evaluating the appropriate weight to assign to medical opinions, including a treating source's opinion that is not assigned controlling weight. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c). The factors include (1) the frequency of the examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). A treating physician's opinion can be contradicted by other substantial evidence, such as opinions of other medical experts. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 889 (2d Cir. 2007).

While opinions from certain non-acceptable medical sources, or "other sources," such as nurse practitioners and physicians' assistants, cannot be used to establish that a claimant has an impairment, these sources' opinions can be used to evaluate "the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, *2 (Aug. 9, 2006); 20 C.F.R. §§ 404.1513(d), 416.927(d). The weight given to the opinions from these other sources should be evaluated using the same factors for treating source opinions. SSR 06-03P, 2006 WL 2329939, at *4-5. Further, "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.* at *5.

The ALJ is required to consider a state agency consultant's findings of fact regarding the severity of an individual's impairment as an expert opinion because these consultants "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, *1-2 (July 2, 1996). Further, a state agency psychological consultant can be entitled to greater weight than an examining psychologist where that consultant's opinion is based on a review of a complete record compared to the limited information that was available to an examining source. *See id.* at *3.

First, Plaintiff contends that the ALJ "failed to give sufficient weight to the findings and conclusions of treating neurologist Dr. Tranmer and treating cardiologist Dr. Siouffi." Dkt. No. 13 at 41. While Dr. Tranmer and Dr. Siouffi were undoubtedly treating physicians as defined by the Social Security Act, a review of the record reveals that neither doctor provided his "medical opinion" concerning the severity of Plaintiff's limitations. Medical opinions that are to be afforded controlling weight if rendered by a treating physician are those "that reflect judgments

about the nature and severity of [a plaintiff's] impairment(s), including [the plaintiff's] symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental restrictions." 20 C.F.R. 404.1527(a)(2). In the present case, Dr. Tranmer and Dr. Siouffi's records consist of recitations of Plaintiff's self-reported symptoms, reports of objective medical testing, and recommendations for further treatments. Neither doctor opined as to Plaintiff's disability status or her ability to function in daily activities or work related situations. To take Plaintiff's argument to its logical conclusion would require an ALJ to specifically define what weight should be afforded to the diagnosis, reports, or treatment recommendations given by any physician that treats a plaintiff on multiple occasions, regardless of whether that physician gives an ultimate opinion as to the nature and severity of their patients impairments as it relates to their alleged disability. Thus, in reading the rules and regulations regarding the medical opinions of treating opinions in their entirety, it is clear that the treating physician rule is meant to provide controlling weight only to those opinions that go to the heart of the ALJ's decision, i.e. whether or not a plaintiff is disabled and to what extent certain impairments limit his or her daily and mental functioning. *See Griffin v. Colvin*, No. 7:12-CV-976, 2014 WL 296854, *9 (N.D.N.Y. Jan. 27, 2014) ("[O]bjective diagnostic test results do not require the six-factor analysis that the Commissioner's regulation establishes for determining how much weight to afford treating physician opinion"). Plaintiff has not cited a specific opinion or statement from Dr. Siouffi or Dr. Tranmer that she contends should be afforded great or controlling weight. Furthermore, the treatment records from Dr. Siouffi and Dr. Tranmer were cited by the ALJ in her discussion of the objective medical evidence supporting her determination. *See* T. at 18. The diagnoses and symptoms reported in each of these doctors' treatment notes, specifically the non-abnormal CT scans of Plaintiff's head and her unremarkable

cardiopulmonary exams, are consistent with the ALJ's determination that no objective medical evidence supported Plaintiff's claims of the severity of her impairments. Accordingly, the Court finds that ALJ did not commit legal error by failing to specifically describe what weight she afforded to the objective medical tests and treatment notes of Dr. Siouffi and Dr. Tranmer.

Plaintiff next contends that the "ALJ erred by giving no weight to the source statement from Plattsburgh Medical Care that [Plaintiff] is unable to work until further notice because of heart disease, anxiety disorder, shunt, and chronic headaches." Dkt. No. 13 at 41. The statement that Plaintiff is referring to is a single page generic report that lists Plaintiff's impairments and has a box checked stating that Plaintiff is "unable to work." T. at 477. This report was signed on December 18, 2012, and it is unclear which medical provider signed the sheet. *Id.* In reviewing Plaintiff's other medical records, the Court determined that on December 18, 2012, Plaintiff saw registered physicians' assistant Eugene Thomas Trotta at Plattsburgh Medical Care for a follow up to a previous complaint of abdominal pain. *Id.* at 580. Mr. Trotta was not the individual who signed the form stating that Plaintiff was unable to return to work. *See id.* at 477, 580. Thus, not only is it unclear who provided the opinion that Plaintiff was unable to work, this determination is also on an issue that is within the sole discretion of the Commissioner to decide, i.e. whether Plaintiff is able to do past relevant work. *See* SSR 96-5P, 1996 WL 374183, *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance"). Accordingly, the Court finds that ALJ did not commit legal error by failing to specifically discuss this one page report signed by an unidentified individual at Plattsburgh Medical Care.

Plaintiff further contends that the ALJ's determination to afford great weight to the opinions of psychological consultant Dr. Brett T. Hartman and physical consultant Dr. David G.

Welch was erroneous. *See* Dkt. No. 13 at 42-43. While this argument is labeled as addressing the weight afforded to these consultants' opinions, it is in essence a contention that the consultants' opinions, even if afforded great weight, do not support the ALJ's RFC determination. Plaintiff contends that Dr. Welch's opinion did not support the ALJ's determination that Plaintiff had the RFC to work on a full-time, sustained basis. Dr. Welch's report states that Plaintiff indicated that she has "recurring episodes of headaches which are largely frontal. These have resulted in frequent lost time from work which has resulted in the loss of at least 2 jobs the most recent of which occurred just recently." T. at 441. This statement in Dr. Welch's report does not necessarily mean that he concluded Plaintiff's impairments caused her to lose her job, rather that is simply what Plaintiff reported to him during her consult. Plaintiff's termination letter from her previous employer PALS, dated August 13, 2012, does not mention Plaintiff's missed work and merely states that the "Board has met and voted to make a few changes in the staffing at PALS. Unfortunately, this means we no longer have a position for you at PALS." *Id.* at 244. Moreover, the Court notes that Plaintiff missed a large amount of work due to an appendectomy unrelated to her impairments on March 3, 2012. *See id.* at 289. Accordingly, nothing other than Plaintiff's subjective belief as stated in her hearing testimony supports her contention that her impairments prohibit her from working full time. *See id.* at 51. Dr. Welch's medical opinion concerning Plaintiff's functioning is that she "is a young lady functioning as a dull normal individual with few if any evidences of physical pathology but showing some difficulties with cognitive function. . . . Her VP shunt appears to be working normally and there was no evidence of cardiac dysfunction seen here in the office today. It does not appear that her recurring headaches are caused by increased intracranial pressure." *Id.* at 442. Further, Dr. Welch reported that Plaintiff demonstrated good ability to ambulate, had a full range of motion in all extremities, her reflexes

were "symmetrically hypoactive at +1 throughout," her motor strength "is consistently close to 4/5 through all 4 extremeties," and her gross and fine motor coordination was intact. *Id.* Dr. Welch also indicated a need for further psychological assessment, which was provided by Dr. Hartman. The Court finds that Dr. Welch's opinion is consistent with the ALJ's RFC determination that Plaintiff is able to perform light work, and the limitations that she must avoid vibrations, heavy moving mechanical parts, and unprotected heights takes into account the moderate physical limitations noted in Dr. Welch's report. Dr. Welch's recitation of Plaintiff's reported symptoms, which she alleged caused her to lose her previous employment, does not render his opinion inconsistent with the RFC determination. Moreover, the ALJ properly afforded Dr. Welch's opinion great weight since he is an examining physical consultant and his opinion is consistent with the other medical evidence in the record. *See* SSR 96-6P, 1996 WL 374180, *2 (July 2, 1996) ("[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . . .").

Dr. Hartman's psychological consult report concludes as follows:

> The claimant is able to follow and understand simple directions. She is able to perform a variety of simple tasks. She has a fair ability to maintain attention and concentration. She has a fair ability to maintain a regular schedule and a fair ability to make appropriate decisions. She has significant learning difficulties and would likely have problems performing complex tasks independently. She has mild to moderate difficulty relating adequately with others. She has moderate problems dealing appropriately with the normal stressors of life.

T. at 447. This final opinion is consistent with the mental limitations that the ALJ placed on Plaintiff's RFC determination that she "is able to perform simple rote tasks; follow and understand simple instructions and directions; have superficial and transactional contact with co-workers and

the general public[, and] . . . requires a fixed work schedule." *Id.* at 17.  To the extent that Plaintiff contends that Dr. Hartman should have administered an IQ test, that issue was addressed above in considering Plaintiff's intellectual impairments.  Accordingly, the ALJ applied the appropriate legal standards in granting great weight to Dr. Welch and Dr. Hartman's consultive opinions and their opinions are consistent with Plaintiff's other medical records and the ALJ's final RFC determination.

Lastly, Plaintiff contends that the ALJ improperly afforded consultant M. Marks "significant some weight." Dkt. No. 13 at 41-42.  The Court interprets the ALJ's granting "significant some weight" as a typo and assumes that she afforded M. Marks "significant weight" or "some weight." *See* T. at 22.  Affording significant or some weight to M. Marks' consultant exam is appropriate in this case since, under either interpretation, it is clearly less than the great weight afforded to Dr. Welch and Dr. Hartman.  The decision to afford less weight to M. Marks' opinion than to the other consultants' opinions is appropriate because M. Marks based his determination on a review of the record evidence, whereas Dr. Welch and Dr. Hartman reviewed Plaintiff's records in combination with conducting personal examinations. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]").  Further, significant or some weight is appropriate for M. Marks' opinion, as opposed to little or no weight, since he is familiar with the Social Security Administration rules and standards and his opinion is consistent with the objective medical evidence. *See id.* at §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").  Indeed, Plaintiff does not cite to any medical records or other evidence that contradicts M. Marks' opinion in his RFC assessment.

Rather, Plaintiff simply contends that the consultant report from M. Marks did not state what his medical qualifications were, such that his opinion should get "very little weight" compared to other examining sources. Contrary to Plaintiff's assertions, the Psychiatric Review Technique form filled out by M. Marks contains the medical specialty code 38. *See* T. at 449. Social Security Programs Operations Manual System ("POMS") DI 24501.004, which identifies medical specialties acceptable to fill out a psychiatric review technique and a mental residual functional capacity assessment, states that specialty code 38 indicates that the consultant was a psychologist. Accordingly, the Court finds that the ALJ's decision to grant some or significant weight to M. Marks' consultant exam is supported by substantial evidence because of his medical qualifications, familiarity with the Social Security rules, review of Plaintiff's medical records, and his opinion's consistency with the other medical records.

### 5. Credibility Analysis

An ALJ assesses a plaintiff's subjective symptoms using a two-step process. *See* 20 C.F.R. §§ 404.1529(c)(1), 404.1545(a)(3), (e); SSR 96-7P, 1996 WL 374186,*1 (July 2, 1996). At the first step, the ALJ must determine whether a plaintiff has an underlying impairment that is established by acceptable clinical diagnostic techniques and could reasonably cause a plaintiff's symptoms. *See* SSR 96-7P, 1996 WL 374186, at *2. If an impairment is shown, the ALJ "must evaluate the intensity, persistence, and limiting effects of the [plaintiff's] symptoms to determine the extent to which the symptoms limit the [plaintiff's] ability to do basic work activities." *See id.* "When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole." *Wells v. Colvin*, 87 F. Supp. 3d 421, 431 (N.D.N.Y. 2015); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).

The entire case record includes a plaintiff's history, laboratory findings, a plaintiff's statements about symptoms, statements and information provided by treating and non-treating physicians, and statements from other people that describe how the symptoms affect a plaintiff. *See* 20 C.F.R. §§ 404.1529(c)(1), 404.1545(a)(3), (e); SSR 96-7P, 1996 WL 374186, at *1. Factors that are relevant to a plaintiff's symptoms include (1) the plaintiff's daily activities, (2) location, duration, frequency, and intensity of symptoms, (3) precipitating and aggravating factors, (4) medications and their side effects, (5) treatment received, (6) measures used to alleviate symptoms, (7) and other factors concerning functional limitations and restrictions due to the alleged symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii). The ALJ found that Plaintiff had underlying, medically determinable impairments that could reasonably be expected to produce her alleged symptoms. *See* T. at 20. However, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible. *See id.* Contrary to Plaintiff's contention, the Court finds that the ALJ's evaluation of Plaintiff's credibility is supported by substantial evidence.

The ALJ discussed each of the general categories of impairments that Plaintiff claims gave rise to her symptoms. First, in discussing Plaintiff's testimony about her symptoms related to her hydrocephalus and VP shunt, the ALJ concluded that Plaintiff's symptoms from this impairment are not a common event. T. at 21. In reaching this conclusion, the ALJ noted that "[t]he last time the claimant had an issue with the shunt was during November-December 2012." *Id.* This visit was for the suspected shunt catheter infection and shunt revision to resolve Plaintiff's headaches and abdominal pain. *See id.* at 1050. While Plaintiff had numerous doctors visits after this hospitalization where she complained of abdominal pain or headaches related to her VP shunt, including an emergency room visit on June 16, 2013, *see id.* at 1149, 1154, the

records from each of these hospitalizations revealed that there were no abnormalities with Plaintiff's shunt. *See id.* at 512, 672, 1149, 1154, 1194.

Regarding Plaintiff's heart impairment, the ALJ concluded that "the condition is relatively asymptomatic." *Id.* at 21. At an April 19, 2012 follow up appointment for a January 26, 2012 cardiology consultation, Dr. Siouffi determined that Plaintiff's inappropriate sinus techycardia was controlled by her beta-blocker prescription. *Id.* at 367, 1202. Plaintiff saw a doctor on a least five other occasions complaining of chest pain between August of 2011 and September of 2012. *See id.* at 886, 910-12, 944, 956, 965, 1000. None of these appointments produced any remarkable diagnostic explanation for Plaintiff's complaints. At a January 9, 2014 appointment, Dr. Siouffi reported that Plaintiff's prior medication had stopped working to control her inappropriate sinus tachycardia and she was prescribed to start on a new prescription. *Id.* at 1200. However, this report, similar to Plaintiff's numerous other cardiology reports, indicated that Plaintiff's cardiopulmonary examination was unremarkable. *Id.*

In regards to Plaintiff's asthma, the ALJ noted that Plaintiff had not been hospitalized for her symptoms and that her condition is "much better on medication." *Id.* at 21. The record evidence indicates that, on nine occasions between December 5, 2011 and May 11, 2012, Plaintiff went to Plattsburgh Medical Care with complaints of congestion, cough, asthma, sore throat, and swollen glands. *Id.* at 407-426. On August 18, 2011, December 13, 2011, and September 1, 2012, Plaintiff went to Champlain Valley Physicians Hospital complaining of asthma symptoms. *Id.* at 871, 922, 967. On November 8, 2012, Plaintiff saw nurse practitioner Sarah Howell regarding complaints of chest congestion and shortness of breath. *Id.* at 567. Plaintiff thought that her anxiety was exacerbating her asthma symptoms. *Id.* On November 12, 2012, Plaintiff sought emergency care for complaints of a cough. *Id.* at 831. On September 26, 2013, Plaintiff

went to urgentcare for asthma related symptoms, where she was prescribed Prednisone and Augmentin. *Id.* at 526-28. On March 25, 2013 Plaintiff reported to Dr. Liberty that her asthma was fairly well controlled and that she only uses her Albuterol inhaler around once per month. *Id.* at 557. The ALJ then addressed Plaintiff's daily activities, which she found were "not limited to the extent one would expect of allegedly disabling symptoms and limitations." *Id.* at 21. These daily activities include "that she cares for her young child, cleans her apartment, does laundry, drives, goes out alone, shops, and handles finances" and "needs no special help or reminders to take care of her personal needs or grooming." *Id.*

The Court finds that the ALJ properly supported her decision to discredit Plaintiff's testimony regarding the frequency and severity of her symptoms. As discussed above, the ALJ compared Plaintiff's daily activities to those that would be expected from a disabled individual, noted that the objective evidence did not indicate that problems with Plaintiff's VP shunt were a common occurrence, properly stated that most of Plaintiff's symptoms are well controlled with medication, and that Plaintiff sought treatment on numerous occasions, but the test results from the majority of these hospital visits did not provide objective medical evidence to support Plaintiff's complaints regarding the severity of her impairments. *See* T. at 21; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii). Further, while Plaintiff testified that she experienced stress seizures "every two weeks," the only medical evidence to support her seizure condition was on April 30, 2010, when Plaintiff received an electroencephalogram ("EEG") report to monitor suspected tonic-clonic seizures. T. at 274. The results of this test indicated that Plaintiff had target events of the seizures, such as eye rolling and stiffening, but "did not have EEG abnormalities associated with them." *Id.* Plaintiff did not receive any further care for her alleged seizure disorder apart from her subjective reports of her condition to healthcare providers.

Accordingly, the Court finds that the ALJ's credibility analysis is supported by substantial evidence because she properly considered the factors required to establish a claimant's credibility and specifically discussed the objective records that discredited Plaintiff's complaints. *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1987) (requiring an ALJ's determination to be supported by specific findings).

Lastly, Plaintiff contends that he ALJ erred by citing Plaintiff's continued smoking of one-half pack of cigarettes per day as evidence that her asthma and heart impairments were not as severe as alleged. *See* Dkt. No. 13 at 35-36. The ALJ commented on Plaintiff's continued smoking after engaging in a lengthy discussion of the objective medical records underlying both Plaintiff's asthma and her heart condition. *See* T. at 18-19, 21. While the Court recognizes that a plaintiff's failure to quit smoking, standing alone, is not sufficient to discredit subjective testimony regarding the severity of asthma symptoms, continued smoking may be considered as one of many factors to discredit a plaintiff's testimony when the objective medical evidence also supports that determination. *Compare Goff v. Astrue*, 993 F. Supp. 2d 114, 128 (N.D.N.Y. 2012) ("[A] claimant's failure to quit smoking will generally be 'an unreliable basis on which to rest a credibility determination'"), *with Kemp v. Comm'r of Soc. Sec.*, No. 7:10-CV-12244, 2011 WL 3876526, *9 (N.D.N.Y. Aug. 11, 2011) (Mag. J. Baxter Report-Recommendation), *adopted by* 2011 WL 3876419 (N.D.N.Y. Aug. 31, 2011) ("The fact that plaintiff has smoked and continues to smoke also belies her claim that she has severe asthma symptoms"). Accordingly, the Court finds that the ALJ did not commit legal error in commenting on Plaintiff's continued smoking in combination with other objective medical evidence to discredit her testimony regarding the frequency and severity of her asthma and heart impairments.

### 6. RFC Determination

Before the fourth step in the disability analysis, the ALJ determines a plaintiff's RFC, which is what a plaintiff can still do despite his or her limitations. *See* SSR 96-8P, 1996 WL 374184, *2 (July 2, 1996). The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairments(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* The assessment takes into consideration the limiting effects of all of a plaintiff's impairments, severe and non-severe, and the determination sets forth the most a plaintiff can do. *See* 20 C.F.R. §§ 404.1545(a)(1), (e); 416.945(a)(1), (e).

Plaintiff contends that the ALJ did not properly determine her RFC by failing to consider all of her impairments in combination. *See* Dkt. No. 13 at 21-30. Contrary to Plaintiff's assertions, the ALJ properly addressed each of Plaintiff's impairments, as discussed above, before determining her RFC. The limitations placed on Plaintiff's ability to perform light work in the final RFC determination reflect that the ALJ considered each of Plaintiff's impairments in combination. The ALJ considered Plaintiff's complaints of headaches caused by her VP shunt and her stress seizures by limiting her work around vibrations, heavy moving mechanical parts, and unprotected heights. Plaintiff's heart condition and asthma were considered in her RFC determination by limiting her to being able to only occasionally climb ramps and stairs. This determination is consistent with Plaintiff's reports that her shortness of breath is exacerbated by exercise. Further, the limitation that Plaintiff must avoid concentrated exposure to respiratory irritants takes into account the effect that her asthma has upon her ability to work in such conditions. Plaintiff's mental impairments, anxiety, and lower intelligence levels were considered in the RFC determination by the limitation that she can only perform simple rote tasks and follow and understand simple instructions and directions. This limitation takes into account the report by

Dr. Hartman that Plaintiff has learning difficulties and troubles completing complex tasks independently. T. at 447. Further, Plaintiff's RFC was limited to having superficial and transactional contact with co-workers and the general public to account for her anxiety with social interactions and larger groups of people. Plaintiff's complaints of back pain and other pain were included in the RFC analysis by limiting her ability to work to that of light work. This limitation takes into account that Plaintiff can lift a maximum of 20 pounds and only repeatedly lift 10 pounds, which is a concern given her impairments of scoliosis and back pain. Concerning Plaintiff's complaints of limited use of her right hand due to her ulnar nerve damage, the ALJ properly concluded that this alleged limitation was not supported by evidence in the record. Further, Plaintiff testified that she has normal use in both of her hands. *Id.* at 46. Concerning Plaintiff's obesity, as discussed above, the record contains no evidence that Plaintiff's obesity impacted her daily functioning in any manner, such that the ALJ did not err in failing to address this issue in the RFC determination given that neither Plaintiff or her attorney brought the issue to the ALJ's attention the lack of any specific mention of obesity in the medical records. Accordingly, the Court finds that the ALJ applied the correct legal standards and that substantial evidence supports the RFC.

Plaintiff contends that the ALJ's decision that she could perform light work was not supported by substantial evidence in the record. *See* Dkt. No. 13 at 30. The regulations define light work at 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do

> light work, we determine that he or she can also do sedentary work,
> unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

Plaintiff contends that she cannot perform light work because she cannot lift over 10 pounds and cannot do a good deal of walking or standing. The only evidence in the record stating that Plaintiff could not consistently lift over 10 pounds is her subjective testimony on this subject. *See* T. at 40. The other medical evidence that references Plaintiff's inability to lift heavier weight does not specifically contradict the ALJ's determination. On February 24 and March 22, 2013, Plaintiff was directed to abstain from lifting while she recovered from her sciatica, but the emergency provider stated that she may "continue with normal activity" after her symptoms improved, which usually occurs within two to four weeks. *See id.* at 750, 772. Plaintiff attended six physical therapy sessions at Champlain Valley Physicians Hospital between April 16 and May 10, 2013. *Id.* at 602-18. After these visits, Plaintiff reported that her back pain had lessened, with some days being pain free and others having pain in the center of her back. *Id.* Thereafter, on September 11, 2013, Plaintiff received a sacroiliac joint corticosteroid injection to help relieve the pain in her lower back. *Id.* at 645-46. While Plaintiff reported that this injection did not relieve her back pain, she indicated that afterwards her pain was mainly located in the upper part of her back, rather than the lower section that had previously caused her discomfort. *Id.* at 647. Given that the hospital records indicate that Plaintiff's back injury was a short term restriction on her ability to lift and that she should be able to return to normal activity after a brief recovery period, coupled with her positive reaction to physical therapy and corticosteroid injection, it is appropriate that the ALJ did not consider the recommendation that she abstain from all lifting as a limitation on her ability to perform light work. The ALJ's determination that Plaintiff could lift up to 20 pounds is supported by the physical RFC completed by consultant Ossenfort after an

interview with Plaintiff and a review of her records. *See id.* at 85-90. The physical RFC report's conclusion that Plaintiff could lift a maximum of 20 pounds and frequently lift 10 pounds was based upon Plaintiff's statements that she could lift 10 pounds and is able to complete daily activities that require frequent and repetitive lifting, such as shopping and cleaning, on a regular basis without assistance. *Id.* at 88-89. This physical RFC report supports the ALJ's determination and is not substantially contradicted by the objective medical evidence in the record. Even if the ALJ erred in finding that Plaintiff could lift up to 20 pounds, any such error would not require a remand since each of the nationally available positions cited by the Vocational Expert and referenced in the ALJ's decision is for a sedentary position, which only requires the ability to lift a maximum of 10 pounds. *See id.* at 72-78; 20 C.F.R. § 404.1567(a); *see also Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration").

In regards to the standing requirements to complete light work, the physical RFC report indicates that Plaintiff is able to walk at least two hours in an eight hour work day, including taking normal breaks. *Id.* at 86. This determination was based upon consultant Ossenfort's interview of Plaintiff in which she stated that she is able to walk one quarter of a mile before having to stop and rest. *Id.* at 88-89. Moreover, Dr. Welch's report indicates that Plaintiff is able to walk on her toes and heals and shows no signs of balance difficulties. *Id.* at 442. Plaintiff testified that she is able to walk for 30 minutes at a time. *Id.* at 45-46. Plaintiff has cited to no medical evidence in the record that illustrates that she is unable to complete a "good deal of walking" throughout a work day. Accordingly, the Court finds that the ALJ's determination that Plaintiff is able to engage in light work, with the noted exceptions listed in the RFC analysis, is supported by substantial evidence.

### *7. Vocational Expert*

Plaintiff lastly contends that the ALJ posed an improper hypothetical question to the vocational expert, i.e., considering Plaintiff's age, education, work experience, and RFC, whether jobs that Plaintiff can perform exist in significant numbers in the national economy. *See* Dkt. No. 13 at 30-31. This argument is based upon Plaintiff's contentions that the expert opinions of her treating physician and the consultative physician were not appropriately weighed in the RFC determination and that the credibility finding was not supported by substantial evidence, specifically that Plaintiff would be off task half the time, that she required constant supervision, and that she has fine manipulation limitations. *See id.* at 31. Plaintiff does not cite to any additional evidence in the record that further supports her contention that she suffers from these limitations. The ALJ properly included Plaintiff's cognitive impairments in the hypothetical question by including the limitation that she is only able to "perform simple, rote, or routine tasks; able to follow and understand simple instructions and directions; is able to have superficial and transactional contact with coworkers and the general public; [and] requires a fixed schedule . . . ." T. at 71. As discussed in this decision, the Court finds that the ALJ properly weighed the expert opinions and properly assessed Plaintiff's credibility to determine the appropriate limitations to Plaintiff's RFC arising from her cognitive impairments. Accordingly, Plaintiff's repetitive arguments are rejected. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 Fed. Appx. 91, 95 (2d Cir. 2011).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the Parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying disability benefits is **AFFIRMED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 16, 2016
      Albany, New York

Mae A. D'Agostino
U.S. District Judge